In the Matter of A SOUND INVEST-MENT CAR STEREO, INC., Debtor.

Albert DIEZ, Peter J. Diez and Olga Alfonso, Plaintiffs,

v.

A SOUND INVESTMENT CAR STEREO, INC., Defendant.

Bankruptcy No. 82–149.
Adv. No. 82–225.

United States Bankruptcy Court,
M. D. Florida,
Tampa Division.

July 30, 1982.

**300**

Marsha G. Rydberg, Tampa, Fla., for plaintiffs.

A. J. Musial, Jr., Tampa, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM OPINION AND FINAL JUDGMENT

ALEXANDER L. PASKAY, Chief Judge.

THIS IS an adversary proceeding and the matter under consideration is a complaint filed by Albert and Peter J. Diez and Olga Alfonso, Plaintiffs, against A Sound Investment Car Stereo, Inc., (Sound Investment), the Debtor in the above-captioned proceeding which filed its petition for relief under Chapter 11 of the Code on January 29, 1982. The complaint filed in this matter seeks to evict Sound Investment from business premises owned by the Plaintiffs.

Based on the evidence adduced at trial and the record in this matter the Court finds as follows:

On March 12, 1981, the Plaintiffs leased to Sound Investment, certain business premises located on North Dale Mabry Blvd. in Tampa, Florida. At that location, Sound Investment was, and still is, presently engaged in the retail sale and installation of automobile stereo equipment. Recently, Sound Investment expanded its operation to include the sale and installation of cruise control devices. In addition, the principals of Sound Investment have formed another corporation, called Polyglycoat of Tampa Bay, Inc., which uses the leased premises as its business address and for storing and wholesaling its product, but it is not selling its product at retail.

During the middle of November, 1981, the Plaintiff, Albert Diez, heard rumors that Sound Investment was in financial difficulty. In an effort to substantiate or dispel these rumors, Mr. Diez confronted Mr. Green, the President of Sound Investment. Green informed him that the rumors concerned the Clearwater and not the Tampa store. At this meeting Green also broached the subject of a possible assignment of the lease to Polyglycoat. Mr. Diez replied he had "no problem with it" but he wanted to talk with his brother and sister, his co-lessors. Viewing that response as a conditional acceptance, Mr. Green had his attorney draft an assignment and consent agreement. Although that agreement was mailed to the Plaintiffs on November 25, 1981, it was never executed by them.

On November 30, 1981, Sound Investment permitted its fire and extended coverage insurance to lapse. The lapse occurred because the insurer advised Sound Investment that it could not obtain replacement coverage. A few days later, on December 4, 1981, the premises was insured by a different company. However, that insurance was written for Polyglycoat and not for Sound Investment. Although the insurance agent attempted to replace the previous coverage, it turned out he was mistaken and the building itself was not insured against the casualty of fire. On March 1, 1982, the property was also insured under the name of Sound Investment. From the testimony of Mr. Diez, it is also clear that, upon learning of the lapse, he too obtained insurance coverage on the premises.

On December 4, 1981, Sound Investment received a letter from the lessors' attorney stating that they would not consent to an assignment to Polyglycoat. This was the first indication to the Defendant that the lessors would not consent to an assignment. That letter also notified Sound Investment that because of the lapsed insurance, the lease was being cancelled. It also instructed the Defendant to vacate the premises by December 15, 1981.

The terms and conditions of the lease prohibit an assignment without the prior written consent of the lessors, limit the use of the premises to the retail sale of automobile radio and stereo equipment and require the lessee to maintain fire and extended coverage insurance. The Plaintiffs contend that the Debtor breached these provisions of the lease and, therefore, they are entitled to evict the Debtor from the premises.

■ At the outset it should be noted that as a Court of equity, this Court has the power to relieve a tenant from forfeiture of its leasehold. *Rader v. Prather*, 100 Fla. 591, 130 So. 15 (1930). In the context of this Chapter 11 proceeding, it is clear that the loss of the leasehold will severely impair, if not destroy, the Debtor's ability to reorganize. Moreover, the loss of this valuable asset will deprive other creditors of the possibility of a meaningful repayment.

■ It also bears mentioning that the Debtor has been making his rental payments in a timely fashion. Thus, this is not a case where the continued occupancy is accompanied by ever-increasing arrearages. With respect to the default for failure to insure the premises, the evidence demonstrated that there had been previous problems with insurance but that the lessors had permitted Sound Investment to cure the defaults. Thus, in light of the past dealings between the parties, it is not surprising that the Debtor assumed it would have a reasonable opportunity to cure the insurance default.

It is also evident that the proposed assignment to Polyglycoat, if it was a breach it was insignificant and merely a technical one caused by a misunderstanding. This does not mean, however, that the assignment was effective. There can be no doubt that in the absence of the lessors written consent to the assignment, no assignment could occur. At the same time, it would be unfair to visit the penalty of forfeiture upon the Debtor for what appears to be a mutual misunderstanding concerning the assignment.

Finally, the Court is satisfied that the sale and installation of cruise control devices is not a material variance from the use restriction in the lease. However, the use of the premises by Polyglycoat as a wholesale distribution center is not in accord with either the assignment or use provisions in the lease. Therefore, the Debtor shall have 30 days from the entry of this order to discontinue the Polyglycoat aspect of its business at the leased premises. In addition, since the Debtor has been relieved of the forfeiture, it must now determine whether or not it will accept or reject the executory portion of the lease.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the principals of the above-captioned Debtor shall have 30 days from the date of entry of this order to discontinue the Polyglycoat business at the leased premises. It is further

ORDERED, ADJUDGED AND DECREED that the above-captioned Debtor shall have 60 days from the date of the entry of this order to assume or reject the executory portion of the lease.